| | |
|---|---|
| MIKUL KLEHM § | |
| § | |
| Plaintiff § | |
| § | |
| v. § | |
| § | |
| RAWLTYN J. HART in his individual capacity; § | 4:22-cv-01226 v. Hart et al |
| § | |
| and § | |
| § | |
| HARRIS COUNTY, TEXAS § | |
| aka § | |
| HARRIS COUNTY SHERIFF'S OFFICE § | |
| § | |
| Defendants § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

COMES NOW, MIKUL KLEHM (hereinafter referred to as "Mr. Klehm"), amending his complaint and complaining of DEPUTY RAWLTYN J. HART ("Defendant") and for cause of action would respectfully show unto this Honorable Court as follows:

### I.   NATURE OF THE CASE

1. This is a civil action arising under the United States Constitution, particularly under the provisions of the Due Process Clause and the Fourth and Fourteenth Amendments to the Constitution of the United States, and under federal law, particularly the Civil Rights Act, Title 42 of the United States Code § 1983, seeking damages against Defendant for committing acts, under color of law, with the intent and for the purpose of depriving Mr. Klehm of rights secured under the Constitution and laws of the United States.

### II.   PARTIES

2. Plaintiff, MIKUL KLEHM, is a citizen of the United States and currently resides in Harris County, Texas.

3. Defendant, DEPUTY HART, is/was employed by Harris County Sheriff's office and was acting within the scope of his employment and under color of statutes, ordinances, rules and regulations, customs and usage of Harris County. At the time of the incident, Deputy Fairchild assumed his role as a peace officer. Deputy Fairchild can be served with process by delivering a copy of the summons and complaint at an address to be provided under seal due to his role in law enforcement.

4. Defendant HARRIS COUNTY, TEXAS a/k/a HARRIS COUNTY SHERIFF'S DEPARTMENT is a municipal governmental entity located in Harris County, Texas, and may be served by serving its County Judge, Lina Hidalgo, Harris County Judge, at 1001 Preston, Suite 911, Houston, Texas 77002.

5. Although Plaintiff may refer to Defendant collectively at times, specific factual references are made concerning actions or inactions by specific Defendant throughout this Complaint – these are not global allegations. As such, this pleading complies with current federal standards. FED. R. CIV. P. 8.

III.   JURISDICTION

6. This action is brought pursuant to 42 U.S.C § 1983, the Due Process Clause and the Fourth and Fourteenth Amendments to the United States Constitution. This Court has jurisdiction of this action under 28 U.S.C. §§ 1331 and 1343. This Court also has supplemental jurisdiction to hear the state claims that will be set forth in this complaint.

IV. VENUE

7. Venue is proper in this district under 28 U.S.C. 1391(b) because the acts, events or omissions giving rise to this claim occurred in Harris County, Texas which falls within the United States Court for the Southern District of Texas, Houston Division.

IV.   FACTUAL BACKGROUND

8. On or about April 16, 2020, Officer Rawltyn Hart of the Harris County Sheriff's office while on duty initiated a stop of a vehicle occupied by Mikul Klehm.  After the aforementioned vehicle tuned onto Beaver Bend Rd., Mr. Klehm exited the said vehicle and ran along a fence line, away from Hart's vehicle, evidenced by a neighbor's video

surveillance (*see* "exhibit a") Hart's vehicle stopped and Hart exited the vehicle, running in the direction of Klehm.

9. The events were caught on video surveillance camera (*see* exhibit a) and a dash camera from Hart's cruiser *see* "exhibit B".

10. Hart claims in his voluntary statement that "he yells 'sheriff's office, drop the gun'". Klem did not hear Hart make any statements or commands. No sound is detected from Hart on the dash cam footage audio of Hart ordering Klehm to stop or even say anything to Mr. Klehm at all.

11. Hart told Detective J. Sanchez Klehm had raised gun in right hand. See "exhibit c" Harts HCSO Voluntary Statement Hart "observed that the male was holding what appeared to silver handgun in his left hand." "raised his left hand and pointed his gun directly at me and yelled 'move.'" *See* "exhibit G"

12. Hart claims the presence of the gun is what prompted Hart to give chase.

13. No weapon can be observed in Klehm's hand in either the security footage or dash camera footage.

14. Hart claims Klehm raised a weapon just before Hart shot Klehm but the video evidence disputes Harts version of the events.

15. Hart told Detective Sanchez of the Harris County Sheriff's Office that Klehm turned around and pointed his gun at Hart and that's when Hart fired his first shots. *See* "exhibit c". The dash camera footage shows Klehm running away and facing away from Hart with Klehm's back to Hart when Hart initiated the shooting. The video evidence does not show Klehm turning toward Hart or making threatening gestures toward Hart or anyone else. The video shows a man fleeing, not what Hart claims. Deputy Hart initiated contact with Mr. Klehm.

16. Mr. Klehm did not threaten anyone. Deputy Hart fired his service weapon four times as Mr. Klehm ran away from the deputy. Two of those shots struck Mr. Klehm's upper legs and one shot struck Mr. Klehm's torso area. The effect of these shots caused Klehm to fall in the middle of the street. Klehm rolled over an estimated six or seven feet and laid down, attempting to surrender. Mr. Klehm was not able to move or flee in any way. He was not within lunging distance of a weapon.

17. Hart claimed Klehm was lying face down when Klehm reached for gun next to Klehm. However, on the dash camera footage, Klehm doesn't appear to be moving at all. Additionally, the alleged weapon was lying in the middle of the street, too far away for Klehm to lunge toward. *See* "exhibit D"
18. In fact, the alleged weapon appears from exhibit D and the dash camera footage to be at Hart's feet when Hart fires the last time, shooting Klehm in the torso again.
19. The video evidence and facts show as Klehm lay supine on the ground, Deputy Hart approached Mr. Klehm to a closer distance and proceeded to shoot Mr. Klehm yet again in Mr. Klehm's stomach.
20. Deputy Hart had at least seven seconds as he slowly walked toward Mr. Klehm. Despite Deputy Hart's clear knowledge that Mr. Klehm did not pose a threat to deputy Hart, any bystanders or other officers, or the public at large, had been shot several times and was unable to walk, and had attempted to surrender, Deputy Hart proceeded to shoot Mr. Klehm as Mr. Klehm was attempting to surrender. Deputy Hart acted with conscious indifference to Plaintiff's rights.
21. Mr. Klehm was unable to get up and the deputy left Mr. Klehm on the ground until EMS arrived.
22. Mr. Klehm suffered multiple cuts, abrasions, bruises, and contusions in addition to the wounds and pain and suffering created by the gunshot wounds.
23. Mr. Klehm was subsequently transported via ems to the hospital to treat the gunshot wounds.
24. Ultimately, Mr. Klehm learned that he had been charged with aggravated assault of a public servant. The affidavit asserted that Mr. Klehm moved a weapon in the officers direction twice, with the second time resulting in Hart shooting Mr. Klehm. However, the dash camera video contradicts Hart's affidavit. The affidavit was signed after Mr. Klehm was arrested. This accusation is false as Mr. Klehm never pointed a weapon at Hart.
25. Here, Hart has shown in the case at hand and in the past he does not follow departmental policies.
    a. The crime suspected was failure to wear a seatbelt and possibly fleeing from such accusation. A traffic violation or class C misdemeanor does not justify the use of

  deadly force and only an incompetent officer on the scene would use force in such a situation.

b. The level of threat or resistance and potential for injury was never present.  Even if it was at one point, the time between the four shot burst and the last shot at point blank range is enough time for an officer on scene to determine further deadly force was unreasonable.

c. Certainly, Hart felt as such as he left the last shot at point blank range out of his initial report.  Surely if the shots were justified, he would have articulated that justification at the start.

d. Not a split-second decision.  The time available for Hart to make a decision and his reasonable access to de-escalation option.  Hart had many de-escalation options, yet he chose the deadliest option of last resort.

e. There were no weapons within the proximity to the Mr. Klehm.

f. Hart in the past has violated departmental policy regarding use of force on more than one occasion.

  i. Hart has a pending 1983 suit for failing to intervene when fellow Officers tazed a handicapped woman in a wheelchair.

  ii. Additionally, Hart has been disciplined for failing to turn on his body camera a multitude of times.

  iii. Hart has been disciplined for failing to complete his continuing education.

  iv. Hart has been disciplined for failing to turn in evidence.

  v. Hart was found to have a .380 handgun with the serial number scraped off in his cruiser vehicle.  The gun should have been in evidence.  The department and news outlets have speculated Hart had the weapon as a "throw down" gun which can be used to justify deadly use of force by officers.

  vi. Hart's use of force was also documented on the nationally known TV show "Cops."  On the episode entitled "Any way you slice it," Hart is observed placing a suspect in an "choke hold/neck restraint" against HCSO Departmental Policy.  The suspect can be heart saying "I can't breathe" and sputtering while the suspect struggled for air.  HCSO can hardly claim it did

        not have knowledge of Hart's activities when it is broadcast on National TV and YouTube. *See* "Exhibit E"

   vii. Hart did not announce his presence of instruct Mr. Klehm to stop or freeze, although it was feasible to do so.

  viii. Hart at no time employed tactical repositioning such as maintaining a safe distance or behind cover.

    ix. Hart did not give Klehm verbal direction.

     x. Hart could not have believed the force used was reasonably necessary.

    xi. Hart did not report all the pertinent information regarding the deadly use of force.

26. Harris County investigated the shooting. The investigation took an extremely long time, longer than it should have under any reasonable circumstances. Hart gave statements during the investigation.

27. During the investigation, the investigator obtained multiple pieces of evidence, including objective physical evidence, that clearly showed Hart was lying about multiple occurrences during the incident. For example, the evidence obtained showed Hart lied about where he discharged his weapon, lied about the fact that Plaintiff raised his weapon, and lied about Klehm lunging for a weapon.

28. Sheriff Ed Gonzalez ("Gonzalez") is the elected Sheriff of Harris County and is a final policy maker for the county. The investigation into the incident made the basis of this lawsuit.

29. Untruthfulness is the worst reason a police officer can be disciplined. Once that finding is made against a deputy, it is considered the "kiss of death" because the deputy can no longer credibly testify in a criminal case. In other words, the deputy's lack of credibility always supplies reasonable doubt in a court of law. This is especially true of a deputy like Hart, whose responsibilities would require him to testify in court.

30. The district attorney brought charges against Hart in front of a grand jury almost two years after the incident. Upon information and belief, the district attorney did not tell the grand jury about Hart's inconsistent statements and the obvious evidence deception about what happened as previously stated in this petition. Purposely omitting obvious evidence of deception is something done only by someone who is plainly incompetent, consciously

indifferent to the obvious harm it would cause, or intentionally trying to secure a "no bill" despite the plainly obvious conclusion that charges should be brought. This omission was designed to secure a "no bill" verdict and allow Harris County to avoid liability and embarrassment. The grand jury "no billed" Hart in March/April 2022.

31. Hart had multiple, previous complaints of misconduct, including the use of excessive force. Hart also had an excessive amount of use of force incidents. Between the time he was hired by Harris County and this incident, Hart had multiple use of force incidents. The use of force on the cops episode was never investigated despite, upon information and belief, multiple uses of force having telltale signs of excessive force being used. Furthermore, upon information and belief, in the previous investigations and use of force reports, Hart made multiple attempts at deceiving the investigators by lying about what happened to cover up his wrongdoing. Hart's deception and tactics were plainly obvious to any investigator, but the investigators in these matters simply ignored these clear signs without regard for the consequences that would plainly follow.

32. The decision to discipline or not to discipline Hart for this incident was made by Sheriff Gonzalez, a final policymaker for Harris County, Texas. Alternatively, the decision was made by a person(s) who was delegated policymaking authority and/or final decision-making ability regarding investigations by a final policymaker. In conjunction with the prior uses of force, investigations, Hart's deceptive tactics, and his history that Harris County was aware of, this investigation made it plainly obvious that the only way to prevent a future use of excessive was to either: 1.) terminate Deputy Hart; or 2.) reassign him to another role where the potential for the use of force or the use excessive force is practically non-existent, such as an administrative role.

33. Hart and Harris County do not have insurance for this incident. Harris County has never required its officers to obtain insurance in case they are sued for excessive force. Harris County has never required its officers to obtain other means to satisfy a judgment against them such as a bond, surety, or other means. Harris County, unlike multiple other municipalities in Texas and throughout the United States, does not pay or otherwise satisfy judgments entered against is deputies for violations of civil rights, including excessive force. It is the official policy, or unofficial custom of Harris County Sheriff's deputies to not obtain such insurance or indemnification so that the deputies remain

"judgment proof" in the event of litigation. This actively discourages litigants and attorneys from filing lawsuits because there is often no ability to recover just compensation for violations of constitutional rights such as the prohibition of excessive force. Because deputies are not held accountable for excessive force, this creates an official policy, or unofficial custom, of normalizing the use of excessive force as the deputies know it is extremely unlikely they will be sued. This was a moving force of the excessive force visited on Plaintiff as stated in this complaint.

34. After the shooting of Mr. Klehm, Harris County Sheriff's Department ratified the actions of Hart and confirmed a pattern of practice evidenced by Deputy Robert Minchew of the Harris County Sheriff's Office Homicide Division served as a spokesman for the policy makers and decision makers of the Harris County Sheriff's Office to KHOU 11. *See* "exhibit F" Deputy Minchew after being asked admitted it was the policy and/or practice of the Harris County Sheriff's Department to consider "any time a suspect has a gun in his hands we are in fear for our lives."  This statement is the justification Harris County used to initially justify the shooting.  Harris County Sheriff's Office used this policy in this instance to justify the shooting of Klehm.  Deputy Minchew went on to state that the deputies are "so well trained" that Hart was "doing great."

35. Despite this clear knowledge, Harris County had the official policy, or unofficial custom, of allowing the shooting of a suspect for merely being in possession of a firearm.

36. In November 2020, the Sunset Advisory Commission issued a Staff Report ("Report") regarding the Texas Commission on Law Enforcement ("TCOLE"). The Report determined Texas' approach to law enforcement has failed to meet the public's needs. It said there is a lack of statewide standards, poor accountability, and inadequate training. The report said that many of TCOLE's struggles are beyond its control. The report stated that TCOLE's minimum standards were outdated and inadequate. It also specifically pointed out that TCOLE had not authority to enforce standards for local sheriff's offices. The report concluded the state's regulatory system is fundamentally broken. The report is indicative of the chronic, widespread, and constitutionally deficient training and oversight for law enforcement in Texas.

37. It is well known and accepted in the policing community in Texas and nationwide that departments in states that have widespread and chronic training and oversight

deficiencies, such as those cited in the Report, have increased rates of excessive force. Further, it is well known and accepted in the policing community in Texas and nationwide that departments who hire deputies in states that have widespread and chronic training and oversight deficiencies have increased rates of excessive force. In other words, it is clear the plain and obvious effect of using TCOLE minimum standards to any degree in hiring, supervision, disciplinary and/or retention decisions will result in an unacceptable increase in the use of excessive force by deputies. Despite this clear knowledge, Harris County had the official policy, or unofficial custom, of using TCOLE minimum standards for hiring, supervision, disciplinary and/or retention decisions regarding patrol deputies like Hart. This was a moving force of the excessive force visited on Plaintiff as stated in this complaint.

38. Because of the constitutionally deficient training and oversight, the failure to require more than a high school degree, the lack of insurance, the ineffective investigations of Defendants, and other official policies and/or unofficial customs, officers like Hart were inadequately equipped to handle situations like those presented to them at the time of the incident. As a result, they respond with illegal, unconstitutional, and excessive force. These official policies and/or unofficial customs, either alone or in combination, were the moving force of the excessive force visiting on Plaintiff as stated in this complaint.

39. Sheriff Gonzalez, the Disciplinary Review Board, the Commissioner's Court, and other final policy makers for Harris County had knowledge of the official policies and/or unofficial customs stated previously. Despite it being plainly obvious to Harris County that continuing these policies and customs would result in an unacceptable increase in excessive force, Harris County chose not to correct, change, or alter any of these policies. In other words, Harris County accepted the inevitable increase and problem with excessive force as "the cost of doing business." This widespread, lax attitude toward excessive force resulted Plaintiff's injuries as alleged in this lawsuit.

40. Because of the acts of the Harris County Sheriff's Department, Harris County, and Officer Hart, Plaintiff has suffered general, special and consequential damages allowed by law. Plaintiff continues to suffer from said injuries.

V. CAUSED OF ACTION

    **i.**    **§ 1983 — EXCESSIVE FORCE**

41. Plaintiff hereby adopts, incorporates, restates, and re-alleges all previous paragraphs, inclusive, with regard to all causes of action.

42. Plaintiff asserts that Deputy Hart used excessive and/or deadly force in the course of the deputie's illegal seizure and arrest of Plaintiff, a free citizen, in violation of the Fourth Amendment and its "reasonableness" standard. Plaintiff asserts that he was unlawfully assaulted by Defendant and unlawfully shot. Said actions resulted directly from the use of force that was clearly excessive to the need, and the use of force was objectively unreasonable. To establish that the Defendant violated Plaintiff's constitutional right to be free from excessive force, Plaintiff must show:

    a) An injury;
    b) Which resulted from the use of force that was clearly excessive to the need; and
    c) The excessiveness of which was objectively unreasonable. See Rockwell v. Brown, 664 F.3d 985, 991 (5th Cir. 2001).

43. As stated in the facts section of the complaint, the Plaintiff suffered multiple injuries as a direct result of the Defendant' actions. The Defendant' actions and/or omissions were "objectively unreasonable" in light of the facts and circumstances confronting the officer without regard to their underlying intention or motivation. Clearly, the facts and circumstances of this particular incident demonstrates the unreasonableness of said actions, including that Plaintiff was unarmed???, and posed no threat or danger to the police. For these reasons, it was objectively unreasonable for the Defendant to have assaulted and tased Plaintiff and their actions were clearly excessive to the need.

    **ii.**    **§ 1983 – Unreasonable Seizure/False Arrest/False Imprisonment**

44. Plaintiff hereby adopts, incorporates, restates and re-alleges all previous paragraphs, inclusive, with regard to all causes of action.

45. Mr. Klehm asserts that he was unlawfully arrested on April 16, 2020, without probable cause to believe he committed a crime. The Fourth Amendment prohibits the police from carrying out unreasonable seizures. An arrest is a "seizure" under the Fourth Amendment. Under the Fourth Amendment an arrest may only be made when a police officer has

probable cause to believe that the person arrested has engaged in criminal conduct. An arrest without probable cause is an unreasonable seizure.

46. Defendant did not have probable cause to seize and arrest Mr. Klehm. Klehm posed no threat to the officer. The facts and circumstances known to the Defendant at the time were not reasonably sufficient to cause a reasonable officer to believe that Plaintiff had committed or was committing a crime, or that he was a threat to officer.

47. Moreover, Mr. Klehm's unlawful, warrantless arrest resulted in his false imprisonment in that Defendant had no lawful right to hold Plaintiff against his will, and transport, and hold his in jail.

### iii. Qualified Immunity Under § 1983

48. Plaintiff hereby adopts, incorporates, restates and re-alleges all previous paragraphs, inclusive, and with regard to all causes of action.

49. Defendant were carrying out a governmental function in effectuating the wrongful detention and arrest of the Plaintiff and employing the excessive use of force. Government actors can be entitled to qualified immunity to their individual liability but this immunity is waived if the complainant shows that:

   a) The individual's act deprived the party of constitutional rights under color of law;
   b) The deprived rights were clearly established and constitutional rights which existed at the time of the acts; and
   c) Such acts were not objectively reasonable under the circumstances, that is, no reasonable official could have believed at the time that the conduct was lawful.

50. In Kinney v. Weaver, the Fifth Circuit explain the "clearly established" prong as follows: Qualified immunity should not be denied unless the law is clear in the more particularized sense that reasonable officials should be "on notice that their conduct is unlawful." Saucier v. Katz, 533 U.S. 194, 206 (2001). The central concept is that of "fair warning": The law can clearly be established "despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior

decisions gave reasonable warning that the conduct then at issue violated constitutional rights. See Hope, 536 U.S. at 740 (internal quotation marks omitted).

51. Plaintiff posed no threat to the deputies and yet he was shot from behind until his body uncontrollably fell to the pavement. Once on the ground he was again shot while he attempted to surrender.   The actions taken by Defendant were excessive and unreasonable under clearly established law.See Kinney v. Weaver, 367 F.3d 337, 350 (5th Cir. 2004) (en banc).

52. Moreover, the right to be free from false arrest has been clearly established since at least 1975. Further, no reasonable officer could believe he had probable cause to arrest Mr. Klehm. As such, the officer are not entitled to qualified immunity.

53. The acts of the Defendant clearly violated established statutory and constitutional rights of which a reasonable person would have known, including the constitutional rights afforded by the Due Process Clause, and the Fourth Amendment of the United States Constitution.

iv. **Ratification by Harris County and Pattern/Practice of Excessive Force**

54. Plaintiff hereby adopts, incorporates, restates and re-alleges all previous paragraphs, inclusive, and with regard to all causes of action.

55. Plaintiff had his rights violated and was injured due to the polices, practices, customs and procedures of Harris County. Defendant Harris County has a practice, custom, culture, procedure, and/or training of permitting and/or encouraging excessive force against suspects.

56. No person, namely Deputy Hart was disciplined after the investigation of this well documented incident the Harris County occurred for a violation, thereby ratifying the conduct as set forth above. Harris County Sheriff's determination after an investigation that lasted over two years that this excessive use of force was consistent with departmental policy created in the department an expectation of impunity for the use of excessive deadly force.

57. According to Harris County statistics, there has been over 3000 excessive use of force allegations made against Harris County Sheriff's department in 2015 alone. However, very few findings of unjustified or firings as a result.

58. Facts supporting the Monell claims are set out quite clearly in this past and pending suits including but not limited to excessive force, failure to train, and/or failure to supervise.
59. The Harris County Sheriff's office has a long history of using an "unnecessary application of force."
60. Deputy Hart has a long history of excessive force known by the Harris County Sheriff's Office.
61. It uses unnecessary force on its detainees, in patrol, and as security officer. On June 9, 2009, the United States Department of Justice ("DOJ") issued a memorandum entitled "Investigation of the Harris County Jail" ("2009 DOJ Memorandum").
62. Of the many constitutional deficiencies identified by the DOJ, two are specifically pertinent to this case: (1) Harris County permitted its employees to use significant force without having measures in place that would enable it to review the propriety of such uses of force; and (2) jail supervisors approved officer' use of force without investigating the need for that force.
63. The DOJ referred to these deficiencies as "systemic."
64. On information and belief, Harris County Sheriff's Office has a history of determining that actions by employees that constitute an unnecessary use of force— specifically shooting of armed suspects—were justified and within the guidelines of policy, procedure, and law, regardless of if the suspect poses a threat to the officer. Further, on information and belief, Harris County Sheriff's Office determined a suspect poses a threat which justifies the use of deadly force by suspicion a suspect is holding a weapon. These policies do not take into account whether the suspect poses a threat to the officers, suspect, or members of the community or the nature of the crime suspected. Such determinations and persistent practices were a driving force behind injuries to suspects, and others outside the jail setting including Mr. Klehm.
65. In April 2017, Harris County Sheriff Deputies used excessive force when they shot and killed Michael Maldonado. In December 2017, five Harris County Detention Officer brutally beat an inmate, Jerome Bartee. In October 2015, two Harris County Sheriff Deputies seriously beat an inmate, Michael Alaniz. In May 2016, Harris County Sheriff Deputies used excessive force against and wrongfully arrested Gilbert Cruz. In June 2011, Harris County Sheriff Deputies used these cases demonstrating custom, policy and

practice of Harris County: SDTX Houston Division Case 4:16-cv-02944 [Dkt. 13]excessive force on Travis Prespentt. In an interview with the Chronicle, Assistant Chief Deputy Mark Herman commented on the Prespentt incident, stating among other things that "these things happen."

66. On information and belief, Harris County to this day has intentionally and consciously disregarded the DOJ's 2009 admonitions and recommendations. Upon information and belief, despite any official policies that may be in writing, Harris County has had actual knowledge of and has permitted and condoned a custom or practice of using excessive force against inmates, detainees and others, in the Harris County jail and denying them proper medical treatment since at least 2009 and continuing to at least November 13, 2015 and beyond.

67. Additionally, the Harris County Sheriff's Department and specifically Deputy Hart have been involved in other instances of excessive use of force, afterward keeping Hart on Duty following the incident.

68. After the shooting of Mr. Klehm, Harris County Sheriff's Department ratified the actions of Hart and confirmed a pattern of practice evidenced by the interview with KHOU 11. The department has an unwritten policy of shooting armed suspects if "they have a gun in their hand."  This policy has been ruled unjustified previously by the Ninth Circuit.  That individual's lawsuit challenged the "Special Rules of Engagement" under which federal agents could "kill any armed adult" male "irrespective of whether the armed adult presented an immediate threat of harm to the agent or to another person.  The Ninth Circuit found that "so extreme an order is patently unjustified,, and confirmed the constitutional standard that "[l]aw enforcement officers may not shoot to kill unless, at a minimum, the suspect presents an immediate threat to the officer or others, or is fleeing and his escape will result in a serious threat of injury to persons.  Accordingly, the officer who shot the plaintiff was not entitled to qualified immunity. Harris v. Roderick, 126 F.3d 1189, 1193 (9th Cir. 1997). 213 Id.

69. These actions and policies of the Harris County Sheriff's Office led Deputy Hart to believe he was justified in shooting Mr. Klehm.

**Plaintiff's claims under the Texas Tort Claims Act for Defendants Harris County, Texas a/k/a Harris County Sheriff's Department**

70. Plaintiff hereby adopts, incorporates, restates and re-alleges all previous paragraphs, inclusive, and with regard to all causes of action.

71. Defendants had a duty of care to Plaintiff. Defendants' conduct fell below the standard of care, and the breach of that standard caused Plaintiff's damages. Furthermore, Defendants were aware of the extreme degree of risk to Plaintiff health, safety and welfare posed by the actions there were about to commit. Despite this actual awareness, Defendants proceeded with conscious indifference to that risk. Defendants acted intentionally, and with malice. Defendants' actions and omissions, negligence, gross negligence, and conscious indifference of Defendants as recited above are also violative of the Texas Tort Claims Act, as set out in Chapter 101 *et seq* of the Texas Civil Practice and Remedies Code. Pursuant to Tex. Civ. Prac. and Rem. Code § 101.25, these governmental entities have waived sovereign immunity and are liable for the damages of Plaintiff for the multiple gunshot wounds he received.

## VI. DAMAGES

72. Plaintiff hereby adopts, incorporates, and restates and re-alleges paragraphs 1 through 66, inclusive, with regard to all causes of action.

73. As a result of Defendant' statutory and constitutional violations, Plaintiff has suffered serious and substantial damages and injuries.

## VII. ATTORNEY'S FEES AND COSTS

74. Pursuant to the Civil Rights Attorney's Fees Award Act, 42 U.S.C. § 1988, Plaintiff asserts right to an award of attorney's fees and costs under its 42 U.S.C. § 1983 pleadings if he prevails.

## VII. RELIEF REQUESTED

75. The preceding factual statements and allegations are incorporated by reference.

76. For these reasons, Plaintiff prays for judgment against Defendant's, any or all of them, for following:
    a) Actual damages;
    b) Pre-judgment and post-judgment interest;
    c) Punitive and exemplary damages against Defendant in an amount to be determined and as allowed by the Court;

    d) Costs of Court; and

    e) Such other and further relief as the Court deems just and equitable including appropriate.

## VIII. JURY DEMAND

77. Plaintiff respectfully demands trial by jury and has tendered the appropriate fee for the same.

**WHEREFORE**

78. WHEREFORE, Plaintiff respectfully requests Defendant be cited to appear and answer herein, and that upon final trial hereof, the Court award the relief against Defendant.

79. Plaintiff further respectfully request that he be afforded all due expediency within the discretion of this Honorable Court to facilitate the preservation of evidence, to demonstrate that such unconscionable conduct will not be tolerated in a civilized society, and to ensure that justice may be served.

Respectfully Submitted,


\_\_\_/s/Joshua Rice_____

Attorney for Plaintiff
josh@bleakneyrice.com
512.541.8251 (o) / 512.532.7964 (f)
100 N. Velasco
Angleton, TX 77515

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing has been transmitted to the all counsel appearing in this cause and pro se parties on this the 15th day of April 2022, by filing with the ECF System of the United States District Court for the Southern District of Texas.

/s/ Josh Rice